Original
No. 2009-265

PETITION OF MARTIN J. DUNN
(New Hampshire Retirement System)

Argued: January 21, 2010
Opinion Issued: August 19, 2010

*Ransmeier & Spellman Professional Corporation*, of Concord (*Daniel J. Mullen* on the brief and orally), for the petitioner.

*Foley Law Office*, of Concord (*Peter T. Foley* on the brief and orally), for the respondent.

CONBOY, J. The petitioner, Martin J. Dunn, appeals a decision of the respondent, the New Hampshire Retirement System (NHRS), denying his application for accidental disability retirement (ADR) benefits. We vacate and remand.

The following facts appear in the administrative record. In 2002, Dunn was hired as the chief of police in the Town of Jaffrey following a satisfactory psychological evaluation and background examination. This position qualifies him as a group II member of NHRS. *See* RSA 100-A:1, VII (a) (Supp. 2009) (defining group II members to include permanent policemen).

In addition to budgetary challenges, Dunn faced a number of stressors beginning in 2004 and continuing through his final day of work in July 2006. In December 2004, Dunn received a letter on NAACP stationery threatening to sue him and the police department. This began a lengthy dispute waged both in the courts and on the internet between Dunn and the letter's author. Although the letter-writer's lawsuit against Dunn was dismissed in late 2006, the internet attacks continued.

In the summer of 2005, Dunn engaged in a public dispute with Jaffrey selectmen over the police department budget. Throughout 2005, staffing shortages and department in-fighting were stressful for Dunn. In September 2005, Dunn applied unsuccessfully for a chief of police position in another town. Around October/November 2005, Dunn discharged a police officer, who then obtained union representation and filed a grievance against Dunn. At this time, Dunn started suffering physical symptoms of stress, including headaches, neck pain, and insomnia, but did not seek medical treatment.

During the fall of 2005, Dunn also undertook an investigation of his supervisor, the town manager of Jaffrey, who was also town counsel. Dunn initiated the investigation following a complaint from the police chief of a neighboring town regarding the town manager. Dunn informed the town manager that he would have to refer the matter to the county attorney. Then, in November 2005, Dunn's separate investigation of a federal loan matter led him to suspect impropriety on the part of the town manager. On December 6, 2005, Dunn informed the town manager that he had contacted the U.S. Attorney, and on December 7, he provided the town manager a copy of the letter he sent the U.S. Attorney.

The next day, December 8, 2005, the town manager suspended Dunn with pay, and conducted a month-long investigation of him. Dunn was subsequently reinstated to his position, although he was given a letter of warning for an incident of insubordination that allegedly took place eighteen months earlier. During this time, Dunn's stress symptoms became severe, including frequent diarrhea, insomnia, and intense and frequent headaches.

After his return to work, Dunn's stressors continued. One of the selectmen stated in an editorial that the board did not want Dunn as police chief, but was unable to fire him because he had not yet done anything wrong. Dunn's employment troubles also became fodder for the letter-writer's ongoing lawsuit against him. In February 2006, Dunn received an email message from a selectman sent to various parties, and apparently inadvertently sent to him, containing derogatory statements about Dunn and questioning his sanity. He "became ill from just reading that e-mail," and called his physician that day to make an appointment.

On February 13, 2006, Dunn saw his physician, Dr. Richard Frechette, and complained of insomnia, frequent headaches, diarrhea, nausea and vomiting. Dr. Frechette was aware of Dunn's job-related issues and, after conducting various tests, he concluded that Dunn's symptoms were stress-related. He suggested that Dunn take two weeks off from work, and Dunn complied.

In early April 2006, after Dunn's symptoms intensified and he developed a rash, Dr. Frechette prescribed medications for anxiety and diarrhea. On Dr. Frechette's recommendation, Dunn also met with Dr. Christopher Benton, a psychiatrist. Dr. Benton agreed that Dunn was experiencing "severe stress associated with on going job conflict," and determined that he was suffering from "Adjustment Disorder with Mixed Anxiety and Depressed Mood." He prescribed medications, and recommended that Dunn seek counseling on a regular basis. On Dr. Benton's suggestion, Dunn began seeing Dr. Melvin Kimmel, a psychologist, in early May 2006, and has continued to see him.

Dunn continued to work until July 2006, when he used two weeks' vacation time and then left on indefinite sick leave on his doctors' advice because his symptoms had not improved. On July 22, 2006, Dunn filed a report of disability, claiming that he had become partially disabled on December 8, 2005, and by July 9, 2006, was totally disabled. On July 27, 2006, Dunn submitted a similar report to Primex, the town's workers' compensation insurer. In October 2006, when his authorized leave time expired, Dunn was terminated.

On August 11, 2006, Primex denied Dunn's application for workers' compensation benefits pending an independent medical examination, because it did not find a causal relationship between Dunn's medical condition and his employment with the town. On November 28, 2006, Dr. Albert M. Drukteinis conducted an independent psychiatric evaluation of Dunn in connection with his pending workers' compensation claim. Dr. Drukteinis agreed that Dunn's symptoms were consistent with "Adjustment Disorder with mixed anxiety and depressed mood," but opined that Dunn's disorder "is not due to his police work at the Town of Jaffrey." Instead, Dr. Drukteinis noted, "[Dunn's] stress appears to have arisen as a result of personnel issues, particularly conflicts with the Town Manager and then the Board of Selectmen. The Adjustment Disorder started about the time of his suspension and the investigation against him, and with the consequence of this to himself and his family."

On February 1, 2007, Dunn applied for ADR benefits, at which time he had four years and four months of creditable service in his position. In connection with the application, Dr. Kimmel filed a treating physician's statement diagnosing Dunn with "Adjustment Disorder with mixed anxiety

and depressed mood," and explaining, "Stress associated with work conflict and [its] aftermath continues to be experienced in the form of personal, physical, social and occupational impairment in functioning." Dr. Kimmel also opined that Dunn's "job related stress" has resulted in continuing physical and psychological symptoms which are likely to be permanent.

In May 2007, Dunn's workers' compensation petition was resolved by a lump sum settlement agreement between Dunn and the Town of Jaffrey in the amount of $95,000, $19,000 of which represented attorney's fees and expenses. On the area of the agreement form marked "Social Security offset," a handwritten notation reads, "This is a settlement premised on permanent total disability at 21 [years] life expectancy."

On August 7, 2007, Dr. Joseph Sack, a psychiatrist retained by NHRS to conduct an additional independent psychiatric evaluation of Dunn, issued his report diagnosing Dunn with a "Major Depressive Disorder, not otherwise stated, with depressive, anxiety and psychosomatic features" and a "Personality disorder, not otherwise stated, with marked obsessive and narcissistic features." Dr. Sack opined that Dunn is not incapacitated from performing the duties of a police chief, stating, "I am of the very strong opinion that it is not his duties as Police Chief that brought about his illness; rather, it is his inability to work with his bosses." Both Dr. Drukteinis and Dr. Sack, who received Dr. Drukteinis's report, pointed to Dunn's application for a police chief position in a neighboring town as evidence that he could perform the duties of a police chief. However, evidence in the record indicates that Dunn applied for that position in 2005, prior to the onset of his disability, rather than in 2006, as the doctors believed. On September 4, 2007, Dr. Kimmel prepared a memorandum refuting Dr. Sack's opinion regarding Dunn's diagnosis and treatment.

On October 9, 2007, the NHRS board of trustees approved the October 9, 2007 recommendation of the NHRS hearings examiner to deny Dunn ADR benefits. The recommendation stated:

> When a member accepts a lump sum settlement of a claim that has been denied by the workers' compensation carrier, the member bears the burden of proof that his injury is work-related. In this case, Dr. Sack, the system's IME[,] has written a 16 page opinion that concludes that the applicant has a personnel issue, not a work-related injury. The IME for workers' compensation, written by Dr. Drukteinis, an IME who frequently evaluates cases for the NHRS, also concludes that the applicant does not have a work-related injury. The applicant's treating psychologist has seen him frequently and notes that he has problems as a result of his experiences but does not distinguish whether those problems arose from police duties or his interactions with the Town

Manager and the Selectmen. Based upon the evidence in the record, the Hearings Examiner finds that the applicant has not met his burden of proof that his psychological injury is work-related and not personnel-related and recommends that the Board of Trustees deny the application for accidental disability retirement.

Dunn moved for reconsideration in November 2007.

On February 5, 2008, Dr. Kimmel updated his 2007 summary of Dunn's diagnosis, treatment, and prognosis. By this time, Dr. Kimmel had met with Dunn on fifty-eight occasions. His diagnosis changed from adjustment disorder with mixed anxiety and depressed mood to an anxiety disorder, not otherwise specified, which included many of the same symptoms, as well as "intrusive recollections of traumatic job-related events." Dr. Kimmel remained of the opinion that Dunn's disability was the result of "severe stress stemming from job-related conflict" and that Dunn was unable to work at that time or for the foreseeable future.

On November 7, 2008, Dr. Drukteinis revised his position based on information that became available after his evaluation of Dunn. He indicated that he had learned of Dunn's workers' compensation settlement and Primex's statement that "[i]t has been determined that this injury/illness was deemed work related" and that the "injury/illness rendered [Dunn] unable to perform [his] duties of Police Chief." Dr. Drukteinis stated that "[s]ince this appears to resolve the factual matter of work-relatedness, I would defer my opinion on that issue." As to Dunn's abilities to perform work as a chief of police in another setting, he likewise deferred to Dunn's treating physicians, who had been providing "ongoing medical, psychiatric, and psychological treatment" during the two years since his evaluation.

In December 2008, a second two-day hearing was conducted before the same NHRS hearings examiner who had recommended denial of Dunn's original petition. On March 10, 2009, the board of trustees of NHRS again accepted the hearings examiner's recommendation to deny ADR benefits to Dunn. In rejecting Dunn's claim that he suffered a "repeated trauma or gradual degeneration" injury, the hearings examiner reasoned:

The applicant posits that his injury arises from repeated trauma or gradual degeneration occurring in the actual performance of duty. He testified to a number of stressful events in 2005 including the lawsuit . . . , his difficulties in hiring officers, overtime due to the lack of officers, the grievance by the union, and his growing dislike of the way the town manager performed his duties. The applicant testified that he suffered from headaches, neck pain, and

insomnia as he kept trying to meet the challenges of his job. However, there is no medical evidence in the record from before the applicant's suspension on 12/8/05 to support a gradual trauma medical or psychiatric injury.

She found, "The weight of the evidence supports a finding that the applicant suffered an occupational disease as a result of his 12/8/05 suspension by the town manager." She based this finding on documentary evidence in the record listing December 8, 2005, as the date of injury, including the forms Dunn prepared in connection with his petitions for workers' compensation and ADR benefits.

Dr. Kimmel had testified before the hearings examiner that the adjustment disorder with which he had originally diagnosed Dunn consists at its heart of "emotional symptoms and behavioral symptoms that can be directly attributable to a specific set of stresses," and that "it wasn't the discipline . . . disciplining [Dunn] wasn't the stress." The hearings examiner nonetheless concluded that "the identifiable psychosocial stressor that caused the applicant's Adjustment Disorder was his unexpected suspension by the town manager on 12/8/05." Moreover, the hearings examiner rejected Dunn's argument that the town manager had acted in bad faith by suspending him one day after Dunn had reported him to the U.S. Attorney. Instead, the hearings examiner referred to "a number of events . . . that might have triggered an examination of the conduct of the applicant in his role as police chief," and took "judicial notice that Jaffrey is a traditional town meeting town which means that the town manager would have been finalizing the budget in November and December. . . . Budget issues may have triggered the investigation." She also noted other potential causes for the suspension.

The hearings examiner ultimately found that Dunn had not sustained his burden of proving medical causation. She stated, "There is a large [workers' compensation] lump sum settlement but there is no evidence that the words '*a settlement premised on total and permanent disability*' are based on a medical finding." (Emphasis in original.) She supported this conclusion by reference to Dr. Drukteinis's 2006 report, but made no reference to his 2008 revised opinion. She also pointed out that none of the prosecutorial officials to whom Dunn reported the town manager's behavior had launched proceedings against the town manager. She ultimately concluded that, "as a matter of law under RSA 281-A:2, XI, the applicant's Adjustment Disorder with Mixed Anxiety and Depressed Mood which resulted from the suspension is not a work-related injury and he does not qualify for [ADR benefits] under RSA 100-A:6." Having reached this conclusion, she did not address the issues of incapacity and permanency.

On appeal, Dunn asserts that the hearings examiner erred by: (1) finding his disability was the result of a single event, rather than repeated trauma or gradual degradation; (2) concluding that he had not met his burden of proving that the disciplinary action was not undertaken in good faith; and (3) failing to report on several pieces of evidence favorable to him, such that the board of trustees did not have all of the relevant information when it adopted her recommendation.

"Because RSA chapter 100-A does not provide for judicial review, a writ of certiorari is the sole remedy available to a party aggrieved by a decision of [NHRS]." *Petition of Concord Teachers*, 158 N.H. 529, 533 (2009). "Our standard of review is whether the board acted illegally with respect to jurisdiction, authority or observance of the law, whereby it arrived at a conclusion which cannot legally or reasonably be made, or abused its discretion or acted arbitrarily, unreasonably, or capriciously." *Petition of Farmington Teachers Assoc.*, 158 N.H. 453, 455 (2009) (quotation omitted). "[T]he determination as to the existence of an injury . . . and the extent of the disability resulting therefrom are questions of fact that will not be disturbed if there is competent evidence in the record." *City of Portsmouth v. Meaney*, 121 N.H. 13, 16 (1981) (quotation omitted).

Dunn's entitlement to ADR benefits requires that he establish total and permanent incapacity for duty as the natural and proximate result of either:

(A) An accident occurring while in the actual performance of duty at some definite time and place; or

(B) Repeated trauma or gradual degeneration occurring while in the actual performance of duty, or arising out of and in the course of employment; or

(C) Any occupational disease arising out of or in the course of employment as defined by RSA 281-A:2, XI, RSA 281-A:2, XIII, or RSA 281-A:17.

RSA 100-A:6, II(c)(1) (Supp. 2009).

Although Dunn argued that his injury was the result of "[r]epeated trauma or gradual degeneration" under subsection (B), the hearings examiner found that he was disabled as the result of an "occupational disease" under subsection (C), but recommended against awarding benefits because she found he had not met his burden of proving medical causation.

The "occupational disease" section of the accidental disability retirement statute refers to RSA chapter 281-A, the workers' compensation statute, for its definition of "occupational disease." RSA 100-A:6, II(c)(1)(C). RSA 281-A:2, XIII defines an occupational disease as "an injury arising out of

and in the course of the employee's employment and due to causes and conditions characteristic of and peculiar to the particular trade, occupation or employment," or "the direct result of an accidental injury arising out of or in the course of employment." RSA 281-A:2, XIII (2010). RSA 281-A:2, XI provides, in pertinent part, that, " 'Injury' or 'personal injury' shall not include a mental injury if it results from any disciplinary action, work evaluation, job transfer, layoff, demotion, termination, or any similar action, taken in good faith by an employer." RSA 281-A:2, XI.

Dunn's burden of proof is set forth in the accidental disability retirement statute as follows:

> The member applying [for ADR benefits] shall have the burden of proving causation before the [NHRS] board of trustees if the member enters into a lump sum settlement of an injury claim that was at any time denied by the employer or the employer's insurance carrier and not found compensable by final decision of the labor commissioner or the compensation appeals board after hearing pursuant to RSA 281-A:43.

RSA 100-A:6, II(c)(3). Because Dunn entered into a lump sum settlement of a workers' compensation claim that had previously been denied, he is required "to prove by a preponderance of the evidence the existence of a work-related injury of the type described in subparagraph (c)(1)(A)-(C), and also that the work-related injury naturally and proximately resulted in [his] total and permanent incapacity from duty." RSA 100-A:6, II(c)(3); *see also Petition of Poulicakos*, 160 N.H. 438, 442 (2010) (RSA 100-A:6, II(c)(3) applies to those claimants who have entered into lump sum settlements and, thus, lack a final finding of compensability of their workers' compensation claims). Because a final finding of compensability of a corollary workers' compensation claim generally serves as a proxy for the determination required under RSA 100-A:6, II(c)(1) that the member's incapacity be caused by a work-related injury, *see Poulicakos*, 160 N.H. at 443, we look to our cases addressing causation under the workers' compensation statute.

"The test for causation has two prongs; a claimant must prove both legal causation and medical causation. Legal causation entails a showing that the claimant's injury is in some way work-related, while medical causation requires a showing that the injury was actually caused by the work-related event or condition." *Appeal of Kehoe*, 141 N.H. 412, 416 (1996) (citation omitted). "The legal causation test defines the degree of exertion that is necessary to make the injury work-connected," and "depends upon the previous health of the employee." *Id.* (quotations and citation omitted).

"Where there is no preexisting condition, *any* work-related activity connected with the injury as a matter of medical fact would be sufficient to show legal causation." *Id.*

Dunn established a lack of preexisting condition through the 2002 psychological pre-employment evaluation report of Dr. Stephen J. Seeman. Therefore, a showing of medical causation would also establish legal causation.

■ "The test for medical causation requires the claimant to establish, by a preponderance of the evidence, that the work-related activities probably caused or contributed to the employee's disabling injury as a matter of medical fact." *Appeal of Kehoe*, 141 N.H. at 417 (quotations and brackets omitted). "Medical causation is a matter properly within the province of medical experts, and the [NHRS is] required to base its findings on this issue upon the medical evidence rather than solely upon its own lay opinion." *Id.* (quotations omitted). "Because a claimant's treating physicians have great familiarity with [his or her] condition, their reports must be accorded substantial weight." *Id.* (quotations omitted).

Dunn's three treating physicians, Dr. Frechette, Dr. Benton, and Dr. Kimmel, agreed that Dunn suffered from job-related stress. Dr. Drukteinis, in 2008, revised his 2006 report to defer to Dunn's treating physicians as to his capabilities, and to Primex as to its finding that Dunn's injury is work-related. Although Primex's finding and Dunn's settlement of his workers' compensation claim are not binding upon NHRS, *see Day v. N.H. Retirement System,* 138 N.H. 120, 125 (1993), NHRS apparently agreed with the medical evidence as to the existence of Dunn's injury: the hearings examiner's report states that "the medical evidence supports an occupational disease." However, in ruling that the evidence did not support a finding of medical causation, the hearings examiner limited her analysis to a single incident of discipline, and concluded that Dunn had not met his burden of establishing that the incident of discipline was not taken in good faith. In so limiting her analysis, the hearings examiner erred as a matter of law.

■ It appears that the hearings examiner did not apply our well-settled standard for a "repeated trauma or gradual degeneration" injury. In evaluating Dunn's "gradual degeneration" claim, the hearings examiner acknowledged his stressors and symptoms, but concluded that "there is no medical evidence in the record from before the applicant's suspension on 12/8/05 to support a gradual trauma medical or psychiatric injury." But we have observed that "[a] cumulative trauma injury often may develop gradually, and with the presence of some pain, resulting in an acute manifestation occurring on a particular day which is so intolerable that it

prevents the claimant from working," in which case the cumulative trauma injury is compensable under our workers' compensation law. *Appeal of Anheuser-Busch Co.*, 156 N.H. 677, 680 (2008) (quotations omitted); *see also Appeal of Briggs*, 138 N.H. 623, 626-28 (1994); *Kacavisti v. Sprague Electric Co.*, 102 N.H. 266, 269-70 (1959).

Moreover, requiring a single traumatic event to establish such a claimed injury constitutes legal error. *See, e.g., Appeal of Briggs*, 138 N.H. at 627. We have held that the department of labor, considering a petition under RSA chapter 281-A, "acted contrary to law when it considered only the effects of a particular accident in evaluating the petitioner's claim for a permanent impairment award." *Petition of Croteau*, 139 N.H. 534, 538 (1995). In *Croteau*, the petitioner had suffered carpal tunnel symptoms prior to a fall at a job site, shoulder pain immediately after the fall, and a neck injury that first appeared in the petitioner's medical records three years after the fall. *Id.* at 536. In focusing on the fall, the hearings officer found that because the petitioner's carpal tunnel syndrome predated the fall, it was not properly the subject of a permanent impairment award, and concluded that the neck injury was the result of a degenerative condition and "that there was little evidence to connect this condition with a single traumatic incident." *Id.* at 539 (quotation omitted). We vacated the department's rulings on the carpal tunnel and neck injuries, *id.* at 538-40, because "[t]he hearing[s] officer was primarily concerned with the effect of the 1988 fall, rather than with an overall evaluation of the petitioner's impairment." *Id.* at 537.

The hearings examiner here made the same error. In evaluating Dunn's petition, she apparently considered his December 2005 suspension to be the sole "accidental injury" underlying his claimed disability and rejected Primex's and the Town's finding of work-relatedness. She seems to have interpreted Dunn's consensus diagnosis of "Adjustment Disorder with Mixed Anxiety and Depressed Mood" to require the identification of a single causal incident, and she identified that incident as Dunn's suspension. Although she references "the totality of the evidence," and observes that "[t]he record contains evidence that the applicant's stress continued until it forced him to leave his job as Police Chief" more than six months after his suspension, she concludes that the "identifiable psychosocial stressor that caused the applicant's Adjustment Disorder was his unexpected suspension." However, many of the documents the hearings examiner cites in support of limiting the basis of Dunn's disability to his December 2005 suspension indicate the presence and effects of other job-related stressors after his suspension. Moreover, the hearings examiner herself reported that the suspension, "a traumatic event," was

"followed by numerous others that caused the stress to continue and intensify." She also cites the medical records from Dunn's first stress-related visit to Dr. Frechette on February 13, 2006, referring to the "anxiety attack the week before," which Dunn explained was a reaction to the selectman's email attacking his sanity and the point at which he finally sought medical attention. Under these circumstances, it appears that the hearings examiner failed to consider the effects of all the asserted stressors in evaluating Dunn's claim.

■ Another indication that the hearings examiner did not analyze Dunn's cumulative trauma claim under the correct standard is her focus on the date when Dunn considered his disability to be "partial," rather than complete. "Cumulative trauma . . . does not result in injury under New Hampshire law until the employee is unable to continue working." *Briggs*, 138 N.H. at 631. Therefore, in evaluating whether Dunn suffered a cumulative trauma injury, the hearings examiner should have considered all of the additional asserted aggravating stressors occurring between Dunn's December 2005 suspension and his July 2006 cessation of duties.

■ Further, we note that the hearings examiner apparently made a distinction between "work-related" and "personnel-related" psychological injury, and concluded that Dunn suffered from a non-compensable "personnel-related" injury. This distinction is not authorized by law. The statute excludes from the definition of "injury" stress-related disability resulting from good faith personnel *action*. RSA 281-A:2, XI. It does not exclude all stress-based injury that is "personnel-related." Here, the petitioner's duties specifically included personnel responsibilities. The record contains the job description for the police chief for the Town of Jaffrey, which includes "responsibility for hiring, separation, evaluation and discipline of staff." It also includes: establishing "Department goals, objectives, policies, regulations, and procedures based upon the needs of the Town and the Police Department"; consulting "with the Board of Selectmen on any major policy changes"; and addressing any "personnel problems affecting any member of the Department." Among the capabilities necessary for the performance of the job is the "[a]bility to maintain effective working relationships with other Town officials, . . . civic leaders, and the public." It is clear, therefore, that "police work" includes personnel-related activities.

■ When the legislature amended RSA 281-A:2 in 2001 to provide that disability resulting from the stress caused by a good-faith disciplinary action is not compensable through the workers' compensation system, it did not alter the burden of proof on the issue of medical causation. An employee does not need to establish that good faith discipline did not cause the

claimed injury; rather, it is the employee's burden to "establish, by a preponderance of the evidence, that the work-related activities probably caused or contributed to the employee's disabling injury as a matter of medical fact." *Appeal of Kehoe*, 141 N.H. at 417 (emphasis, quotations and brackets omitted); *cf. Appeal of Malouin*, 155 N.H. 545, 547-48 (2007) (setting forth the test for whether an injury arises out of and in the course of employment).

Accordingly, we vacate and remand for further proceedings consistent with this opinion, and need not address the petitioner's remaining arguments.

*Vacated and remanded.*

BRODERICK, C.J., and DALIANIS, DUGGAN and HICKS, JJ., concurred.